**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. ELH-16-0402** |
| **COREY RILEY,** | |
| **Defendant** | |

**RESPONSE TO DEFENDANT'S MOTION FOR SENTENCING REDUCTION**

The United States of America, by counsel, responds to the motion for reduction of sentence filed by the defendant Corey Riley.

The facts of this case were set forth on the plea agreement signed by the defendant, attached as Exhibit 1. The factual stipulation described the offense (in pertinent part) as follows:

The first part of the stipulation established the defendant's offense of possession with the intent to distribute fentanyl. Exhibit 1 at 10. On January 26, 2016, Baltimore Police officers, acting on a tip and other information, conducted a traffic stop of a vehicle in Baltimore City, Maryland. Earlier, officers had seen the defendant leave a residence on Greenspring Avenue in Baltimore, Maryland and place a bag in the trunk of a car. Riley then got into the vehicle (which was an Uber) and was a passenger at the time of the traffic stop. Officers had a trained police canine conduct a sniff test on the car, and the dog gave a positive alert for the presence of narcotics near the trunk of the car. From the trunk, officers recovered approximately 3,465 grams of fentanyl (confirmed by lab analysis). Officers also found a kilogram press inside the bag. Officers also seized approximately $61,808 in United States currency. The defendant admitted that he possessed the fentanyl and intended to distribute the fentanyl. *Id.*

1

The defendant was initially charged in Maryland state court and made bail.  Riley then left the United States and traveled to Mexico in an attempt to evade prosecution.  On October 25, 2017, Riley was arrested in California.  The defendant also admitted that he had engaged in a conspiracy commit money laundering in connection with the drug activity.  That crime included conducting financial transactions, including the payment of cash to drug suppliers and other transactions, in order to promote the carrying on of their ongoing conspiracy to distribute narcotics.  *Id.* at 9-10.

On January 10, 2018, consistently with the plea agreement's Rule 11(c)(1)(C) plea provision, the Court sentenced the defendant to 78 months' imprisonment.  ECF 24, 25, 26.  The defendant now seeks a reduction of his sentence in light of the COVID-19 situation, and his own identified health problems.

In this case, the government does not contest that the defendant has demonstrated eligibility for consideration of a § 3582 motion.  However, the government respectfully does not believe that the Court should reduce the defendant's sentence, in light of the 18 U.S.C. § 3553(a) factors in this case.  In the following sections, the government will (1) discuss the law governing compassionate release motions; (2) discuss the measures being taken in the Federal Bureau of Prisons to address COVID-19; and finally, (3) discuss the application of 18 U.S.C. § 3582(c)(1) to this case.

## LAW CONCERNING COMPASSIONATE RELEASE MOTIONS

The requirements for a compassionate release motion are found in the following provisions: the statutory framework of 18 U.S.C. § 3582(c)(1)(A), and the policy statement of the U.S. Sentencing Commission in U.S.S.G. § 1B1.13.

I.    **Court's authority to adjudicate motions for compassionate release.**

In this case, the defendant has satisfied the administrative requirements to apply to the Court for a compassionate release reduction.

II.   **Grounds for compassionate release.**

After exhaustion of administrative remedies, the statute establishes a two-step inquiry:

> **First**: The Court must determine if an inmate is eligible[1] for a sentence reduction that is: (A) warranted by "extraordinary and compelling reasons"; and (B) consistent with applicable Sentencing Commission Policy Statements.
>
> **Second**: If the Court finds inmate is eligible for compassionate release, it must then consider whether a sentence reduction is warranted according to the factors set forth in 18 U.S.C. § 3553(a).

*See* 18 U.S.C. § 3582(c)(1)(A); *see also Dillon v. United States*, 560 U.S. 817, 826-27 (2010) (holding that parallel language in Section 3582(c)(2) establishes a similar two-step inquiry)).

The burden is on the inmate to demonstrate that he has exhausted administrative remedies and that there are extraordinary and compelling reasons to reduce his sentence. 18 U.S.C. § 3582(c)(1)(A); *United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020); *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (holding that an inmate, "as the § 3582(c)(2) movant, bears the burden of establishing" eligibility).  Even for those inmates who are statutorily eligible for a reduced sentence, compassionate release is a "rare" and "extraordinary" remedy.  *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *White v. United States*,

---

[1]    Certain defendants at least 70 years old are eligible for sentence reductions, a provision not applicable in the instant case. *See* 18 U.S.C. § 3582(c)(1)(A)(ii)

378 F. Supp. 3d 784, 787 (W.D. Mo. 2019) (holding that "a compassionate release . . . is an extraordinary and rare event."); *United States v. Mangarella*, 2020 WL 1291835, at *2-3 (W.D.N.C. Mar. 16, 2020).

Section 3582(c)(1)(A) of Title 18, as amended by the First Step Act, provides in relevant part:

> (c) Modification of an imposed term of imprisonment. — The court may not modify a term of imprisonment once it has been imposed except that —
>
> > (1) in any case.—
> >
> > > (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
> > >
> > > > (i) extraordinary and compelling reasons warrant such a reduction;
> > > >
> > > > […]
> > >
> > > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission […].

118 U.S.C. § 3582(c)(1)(A).

As was the case prior to enactment of the First Step Act, § 3582(c)(1)(A) permits compassionate release based on "extraordinary and compelling reasons." *Id*. The Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples.

Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."  28 U.S.C. § 994(t).

Because § 3582(c)(1)(A) permits a sentencing reduction only to the extent that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission," the pertinent policy statement, found at U.S.S.G. § 1B1.13, is binding on the Court. 18 U.S.C. § 3582(c)(1)(A);  *see also Dillon*, 560 U.S. at 827 (Because § 3582(c)(2) only permits sentence reductions "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the applicable policy statement is binding).  As is relevant here, Application Note 1 of § 1B1.13 defines "extraordinary and compelling reasons" as follows:

1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2),[2] extraordinary and compelling reasons exist under any of the circumstances set forth below:

(A) Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) **suffering from a serious physical or medical condition**,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

---

[2]     Subsection (2) of § 1B1.13 establishes as a relevant factor that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

that **substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility** and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13 app. note 1 (emphasis added).

The policy statement in § 1B1.13 is not the only source of criteria the Court may apply in determining whether "extraordinary and compelling reasons" exist to justify a reduction. As noted above, Application Note 1(D) permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 app. note 1(D). Accordingly, a court may grant compassionate release only on grounds specified by the Sentencing Commission, or those set forth in the relevant BOP regulation governing compassionate release.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205.[3] Notably, both the Guideline policy statement in § 1B1.13 and BOP Program Statement 5050.50 limit "extraordinary and compelling reasons" for compassionate release to circumstances involving illness, declining health, age, or exceptional family circumstances.

Altogether, the aforementioned authorities (including § 3582(c)(1), the U.S.S.G. policy statement, and case law) establish a three-pronged analysis for compassionate release: (1) the

---

[3]  Bureau of Prisons Program Statement 5050.50 is available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. This program statement was amended effective January 17, 2019, following passage of the First Step Act. It replaces the previous program statement, 5050.49, CN-1.

inmate must establish extraordinary and compelling reasons for release; (2) the reduction/release must be consistent with Sentencing Commission policy statements, including that the inmate is no longer a danger to the community, as discussed in U.S.S.G § 1B1.13; and (3) the analysis of the 18 U.S.C. § 3553(a) factors must warrant release.

## BOP RESPONSE TO COVID-19

The BOP has taken aggressive action to mitigate the danger of COVID-19.  In early 2020, the agency established a COVID-19 working group to develop responsive procedures in consultation with experts from the Centers for Disease Control ("CDC").  On March 13, 2020, the agency implemented the COVID 19 Phase Two Action Plan ("action plan") in order to minimize the risk of COVID-19 transmission into its facilities.  The action plan comprises several preventive and mitigation measures, including the following:

**Screening of Inmates and Staff:** All new BOP inmates are screened for COVID-19 symptoms and risk of exposure.  Asymptomatic inmates with a documented risk of exposure will be quarantined, and symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols.  In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures.  Staff registering a temperature of 100.4 degrees or higher will be barred from the facility on that basis alone.

**Contractor Access:** Contractor access to BOP facilities is restricted to only those performing essential services (including medical or mental health care) or those who perform necessary maintenance on essential systems.  All volunteer visits are suspended absent authorization from the Deputy Director of BOP.  Any contractor or volunteer who requires access will be screened using the same procedures as applied to staff prior to entry.

**Quarantine Logistics:** The action plan directs all BOP institutions to assess their stockpiles of food, medicines, and sanitation supplies and to establish quarantine areas within their facilities to house any detainees who are found to be infected with or at heightened risk of being infected with coronavirus pursuant to the screening protocol.

**Suspension of Social Visits and Tours:** BOP has placed a 30-day hold on all social visits, such as visits from friends and family, to limit the number of people entering the facility and interacting with detainees.  In order to ensure that familial relationships are maintained

throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month.  Tours of facilities are also suspended for at least the first 30 days that the action plan is in effect.

**Suspension of Legal Visits:** BOP has placed a 30-day hold on legal visits, though such visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

**Suspension of Inmate Movements:** BOP has also ceased the movement of inmates and detainees among its facilities for at least the first 30 days that the action plan is in effect. Though there will be exceptions for medical treatment and other exigencies, this will prevent transmissions between institutional populations. Likewise, all official staff travel has been cancelled, as has most staff training.

**Modified Operations:** Finally, the action plan requires wardens at BOP facilities to modify operations in order to maximize social distancing.[4]

The measures enumerated in BOP's plans are designed to sharply mitigate the risk of COVID-19 transmission into BOP facilities. As communicated to the Government, BOP professionals will continue to monitor the path of the virus and adjust its practices as necessary to maintain the safety of BOP inmates.  *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (Third Circuit taking note of the "BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread").

## ARGUMENT

**I.    The Government Does Not Contest That the Defendant Is Eligible for Compassionate Release.**

As discussed above, a defendant is only eligible for a reduction in his sentence under 18 U.S.C. § 3582(c)(1)(A) if: (1) extraordinary and compelling reasons warrant the reduction; (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18

---

[4] Further details are available at www.bop.gov/resources/news/20200313_covid-19.jsp, and at the regularly updated resource page, www.bop.gov/coronavirus/index.jsp.

U.S.C. § 3142(g); and (3) the reduction is consistent with the Sentencing Commission's Policy Statement, particularly the requirement that the reduction be warranted by the factors set forth in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1); U.S.S.G. § 1B1.13.

An inmate bears the burden of establishing that a sentence reduction is warranted. *United States v. Mattingley*, 2020 WL 974874, at *3 (W.D. Va. Feb. 28, 2020) ("the party trying to change the status quo" has the "burden to prove that he is entitled to a reduction of sentence under § 3582(c)(1)"); *United States v. Edwards*, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020) ("A defendant who seeks compassionate release under § 3582(c)(1)(A)(i) has the burden of establishing that such relief is warranted"); *United States v. Heromin*, 2019 WL 2411311 (M.D. Fla. June 7, 2019) (same); *United States v. Stowe*, 2019 WL 4673725, at *2 (S.D. Tex. Sept. 25, 2019) (same); *United States v. Karr*, No. 6:17-cr-25-REW, 2020 WL 774363, at *3 (E.D. Ky. Feb. 18, 2020) (same); *United States v. Mitchell*, No. 5:10-cr-50067-001, 2020 WL 544703, at *2 (W.D. Ark. Feb. 3, 2020) (stating that it is the defendant's burden to prove entitlement to compassionate release); *United States v. Israel*, No. 05-cr-1039 (CM), 2019 WL 6702522, at *9 (S.D.N.Y. Dec. 9, 2019) (same).

Current Department of Justice policy is that if an inmate presents one of the factors identified by the Centers for Disease Control that poses an increased risk of severe illness from COVID-19, they should be considered to be suffering from a "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"— even if that condition in ordinary times would not meet the terms of the policy statement. *See* U.S.S.G. § 1B1.13 cmt. n. 1(A)(ii)(I).  These CDC risk factors include: people 65 years and older;

people who live in a nursing home or long-term care facility; and, most importantly for this case, people of all ages with underlying medical conditions, particularly if not well controlled, including:

- People with chronic lung disease or moderate to severe asthma

- People who have serious heart conditions

- People who are immunocompromised. Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications

- People with severe obesity (body mass index [BMI] of 40 or higher)

- People with diabetes

- People with chronic kidney disease undergoing dialysis

- People with liver disease

*Centers for Disease Control, "People Who Are at Higher Risk for Severe Illness,"* available at

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html,

(accessed May 28, 2020).





Also, the government does not assert in this case that the defendant presents a danger to the community in a way that would preclude a reduction under § 3582(c)(1).

Accordingly, the government does not contest that the defendant is eligible for a sentencing reduction under 18 U.S.C. § 3582(c)(1).  In the next section, the government will address the 18 U.S.C. § 3553(a) factors.

## II.   The Defendant's Motion Should Be Denied Under the Factors Set Forth in 18 U.S.C. § 3553(a).

Once a defendant has met the threshold requirements for compassionate release (a point that the government does not contest here), the Court must then consider whether a sentence

reduction is warranted according to the factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A); *see also Dillon*, 560 U.S. at 826-27 (holding that parallel language in Section 3582(c)(2) establishes a similar two-step inquiry); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).  In this case, the defendant's request should be denied.

Section 3553(a) provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary," to comply with the purposes described in § 3553(a)(2):

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D).

Here, the totality of those factors weigh against a reduction of sentence.  With respect to the seriousness of the offense, the defendant committed a very serious, very substantial drug distribution offense involving more than three kilograms of fentanyl, a dangerous narcotic that is responsible for a large number of overdose deaths in Baltimore, in Maryland, and throughout the country.  The defendant was also found with a substantial amount of money and stipulated that the drug conspiracy involved money laundering.  Finally, the defendant actually fled to Mexico in order to evade prosecution.  *See* Exhibit 1, Plea Agreement at 9-10.

With respect to the need for deterrence, and to protect the public from further crimes of the defendant, the nature of the offense (a large fentanyl distribution case) should be considered along

with the defendant's own criminal record.  The defendant does have a substantial record, including two prior federal drug-trafficking convictions (Presentence Report at ¶¶ 38-29), a burglary conviction in 2016 (PSR ¶ 40), and a battery on a police officer (to be clear, a more dated conviction, in 2002, PSR ¶ 37).

The government does recognize that there is no violence in this case.  Nevertheless, the issue for the government is that to reduce the defendant's case further would completely eliminate any deterrence effect, and would result in a sentence that simply does not reflect the seriousness of the offense, or the need for a sentence that serves the 3553(a)(2) factors.  The defendant has a projected release date of December 31, 2022, and has only served two years and eleven months of his 6.5 year sentence.  *See* BOP Sentencing Computation Data, at 5, attached as Exhibit 4. Reducing the defendant's sentence at this stage to time served would render his sentence well below the original, intended sentence.

There is a final consideration that should be mentioned, that actually favors the defendant's claim.  He is incarcerated at a federal facility in which a number of COVID-19 positive cases have been reported.[6]  The defendant is currently housed at the Federal Correctional Institution in Lompoc, California (Lompoc FCI), and BOP information indicates that the following COVID-19 positive cases have been reported at the Lompoc complex (including the FCI and the neighboring U.S. Prison)[7]:

---

[6]   *See* https://www.independent.com/2020/05/26/third-inmate-dies-as-hundreds-protest-against-lompoc-prison-covid-conditions/;
https://www.aclusocal.org/sites/default/files/aclu_socal_torresvmilusnic_202005116_complaint.pdf.

[7]   *See* https://www.bop.gov/coronavirus/ (visited May 28, 2020).

| Facility | Inmates Positive ▾ | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered | City | State |
|---|---|---|---|---|---|---|---|---|
| Lompoc USP | 53 | 10 | 2 | 0 | 110 | 14 | Lompoc | CA |
| Lompoc FCI | 19 | 8 | 1 | 0 | 884 | 10 | Lompoc | CA |

Thus, a substantial number of cases have been reported at those facilities per the above data.

Taken together, the government's analysis is as follows: the defendant is serving a reasonable sentence for a serious drug-trafficking offense.  Although the offense did not involve violence, it was a substantial offense and the defendant has a lengthy record.  An appropriate

extensive set of measures to address the COVID situation.  To be sure, the Lompoc BOP facility has had a substantial COVID presence, and the government does not disagree with the defense that this is a matter of concern.  Nonetheless, the balance of evidence, including the defendant's crime, BOP's measures, the defendant's health, and the COVID situation, do not favor release, in the government's view.

### III.   In the Event the Court Orders Release, the Government Recommends Particular Release Conditions

In the event that the Court does order a reduction of the defendant's sentence, the government would recommend that the order include some specific provisions of release:

First, the government recommends that the defendant be placed on home detention through December 31, 2022, the date originally set for his possible release from BOP.  Such a requirement would provide for some continued punishment for the original offense, and would provide some

14

proportionality between the defendant's crime, his past record (including federal offenses), and the reduced sentence.

Second, *prior to any release*, the government recommends that the Court impose a 14-day quarantine period and medical clearance to minimize the possibility of any spread of COVID-19 from the inmate to the public.  There are several reasons for this.  First, a 14-day monitoring period is in the defendant's best interest because if he does become COVID-19 symptomatic, he would have immediately available medical treatment from his BOP facility.  Second, ensuring the defendant is healthy will protect the health of the family members with whom he plans to reside following release.  Third, the 14-day quarantine period is in the interests of public health because it will minimize the possibility of the defendant exposing other persons to any illness.  Finally, the 14-day period will allow BOP to conduct any appropriate transitional processing for the defendant.

## CONCLUSION

The government respectfully requests that the Court deny the defendant's motion for a sentence reduction.

Respectfully submitted,

Robert K. Hur
United States Attorney


By:_____/s/_____
Michael C. Hanlon
Assistant United States Attorney

36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
410-209-4895
Michael.hanlon@usdoj.gov

15

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 28th day of May, 2020, a copy of the foregoing Motion was sent by ECF service to:

C. Justin Brown, Esquire

_____/s/_____
Michael C. Hanlon
Assistant United States Attorney