IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA
    *Plaintiff*,

v.

                                    Criminal No.:  ELH-16-0402

COREY RILEY,
    *Defendant.*

**MEMORANDUM OPINION**

Defendant Corey Riley, through counsel, has filed and "Emergency Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)." ECF 29.  The Motion is supported by a sealed memorandum of law (ECF 31) (collectively, the "Motion") and two exhibits, including portions of Riley's medical records.  ECF 31-1 to ECF 31-2.[1]  Riley, who is 43 years of age, asserts "extraordinary and compelling reasons" based on his serious heart condition, the COVID-19 pandemic, and his incarceration at the Lompoc complex, which he describes as "the hardest hit facility" within the Bureau of Prisons ("BOP") with regard to COVID-19 cases.  ECF 31 at 2.  The government opposes the Motion.[2]  ECF 36;[3] ECF 39.  It has also submitted several exhibits.  ECF 36-1 to ECF 36-4.  Riley has replied.  ECF 40.

---

[1] Some of the records are in the name of inmate David Bigby, with a date of birth in December 1979. *See* ECF 31-1 at 1.  The Amended Presentence Report (ECF 28, "PSR") reflects that Corey Riley has several aliases, including that of David Bigby.  *Id.* at 3.

To the extent submissions were filed under seal, it is because they contain information about defendant's health.

[2] The government's initial response is docketed at ECF 36.  The government submitted further correspondence (ECF 39) to correct the dates of Riley's eligibility for home confinement and release.

[3] A redacted version of ECF 36 is docketed at ECF 37.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant the Motion.

## I.   Background

On August 9, 2016, a federal grand jury sitting in the District of Maryland returned an indictment against Riley, charging him with possession with intent to distribute fentanyl on January 26, 2016, in contravention of 21 U.S.C. § 841(a)(1).  ECF 1.  He was arrested on July 11, 2017.  ECF 9.

On November 7, 2017, Riley entered a plea of guilty (ECF 21) to a two-count Superseding Information.  In the Information (ECF 15), he was charged with one count of possession of fentanyl with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  *Id.*  The plea was entered pursuant to a Plea Agreement (ECF 18) and tendered under Fed. R. Civ. P. 11(c)(1)(C).  *Id.* ¶ 9.  Under the Plea Agreement, Riley also admitted to violations of supervised release in two criminal cases: ELH-16-094 (D. Md.) and RDB-05-0487 (D. Md.).  *Id.* ¶ 1.[4]  Pursuant to the C plea, the parties agreed to a total sentence of 78 months' incarceration. *Id.* ¶ 9.

The Plea Agreement included a stipulation of facts.  *Id.* at 10-11.  According to the stipulation, defendant was stopped by Baltimore City police officers on January 26, 2016.  *Id.* at 10.  The officers had witnessed Riley "leave a residence on Greenspring Avenue in Baltimore, Maryland and place a bag in the trunk of a car." *Id.*  Riley then entered the vehicle.  *Id.*  During the traffic stop, a trained canine alerted to the presence of narcotics.  *Id.*  From the trunk of the

---

[4] Jurisdiction for Case ELH-16-092 was transferred from the United States District Court for the Southern District of New York.  *See id.*, ECF 1.

vehicle, the officers recovered approximately 3,465 grams of fentanyl as well as a kilogram press and $61,808 in U.S. currency.  *Id.*

A search warrant was executed for the Greenspring Avenue residence.  Police recovered $28,722 from the residence, as well as a handgun belonging to a co-conspirator and other evidence of drug distribution.  *Id.*

Riley was initially charged by the State of Maryland and made bail.  *Id.*  While on bail, he fled to Mexico to evade prosecution.  *Id.*  Riley was arrested in California on October 25, 2016.  *Id.*

Subsequent to the events of January 26, 2016, investigators conducted a search of an apartment on Toone Street in Baltimore, which was believed to be Riley's stash location.  *Id.* at 11.  There, they found drug paraphernalia, $14,020, and keys to a Hyundai rental vehicle.  In the vehicle, which was rented under the name of a woman, investigators "found documents in the car in the name of Riley," as well as $3,760.  *Id.*

An ongoing investigation revealed that Riley was "a member of a narcotics conspiracy and a conspiracy to commit money-laundering in furtherance of narcotics activity."  *Id.* at 10.  Riley's involvement in the conspiracy began at least by January 2016 and continued until his arrest in California in October 2016.  *Id.*  Riley's role involved obtaining "narcotics from suppliers" and arranging "for money to be paid to those suppliers from drug proceeds."  *Id.*  Riley and his co-conspirators agreed "to conduct financial transactions, including the payment of cash to drug suppliers and other transactions, in order to promote the carrying on of their ongoing conspiracy to distribute narcotics."  *Id.* at 10-11.

As indicated, defendant's guilty plea was tendered pursuant to Fed. R. Crim. P. 11(c)(1)(C).  ECF 18, ¶ 9.  Under the Plea Agreement, the parties agreed to a term of imprisonment of 78

months.  *Id.*  They also agreed that the "78-month sentence should run concurrently with any sentences imposed in connection with the defendant's supervised release cases in criminal numbers ELH 16-094 and RDB-05-0487."  *Id.*

Judge Bennett conducted sentencing on January 10, 2018.  ECF 24.  According to the Amended Presentence Report (ECF 28, "PSR"), the defendant was 40 years of age.  After deductions for acceptance of responsibility under § 3E1.1 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), Riley had a final offense level of 29.  *See* ECF 28, ¶¶ 26-28.

Riley's prior offenses included two federal convictions.  *Id.* ¶¶ 38, 39.  In particular, he was convicted in this District of a drug distribution offense (cocaine and heroin), referenced in Paragraph 38 of the PSR, for which Judge Bennett imposed a sentence of 72 months' imprisonment.  *See* RDB-05-0487.  He received a sentence of 90 months' imprisonment in the Southern District of New York for the distribution of heroin offense referenced in Paragraph 39 of the PSR.  That case was transferred to this District and became case ELH-16-094.  In sum, Riley had 8 criminal history points, with a Criminal History Category of IV.  ECF 28, ¶¶ 41, 42.

Riley's Guidelines called for a sentence ranging from 121 to 151 months of imprisonment. *Id.* ¶ 91.  In accordance with the terms of the C plea, however, the Court imposed concurrent sentences of 78 months' incarceration for Counts One and Two of the Information, with credit from June 20, 2017.  ECF 26 (Judgment).  In addition, as to both violations of supervised release, the Court imposed sentences that ran concurrent with the sentences imposed in this case.  *Id.*

Riley is presently incarcerated at USP Lompoc, where there have been 73 positive COVID-19 tests and two inmate fatalities as of May 18, 2020.  ECF 31 at 1.  According to Riley, he was previously housed at FCI Lompoc, a minimum security prison, but he apparently was transferred

because of the high incidence of COVID-19 at FCI Lompoc. *Id.* at 2. He had completed four

months of the RDAP program and has "a clean disciplinary record." ECF 31 at 14. He is eligible

for home confinement on June 30, 2021, and his projected release date is December 31, 2021.

ECF 31 at 2; ECF 39.

On April 7, 2020, Riley petitioned the Warden at Lompoc for compassionate release,

pursuant to 18 U.S.C. § 3582(c). ECF 31-2 at 1. He received no response. This Motion followed

on May 18, 2020. ECF 29; ECF 31.

## II.     Discussion

### A.  Statutory Background

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed."

18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United*

*States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395

(4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v.*

*United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is

"expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i)

provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part

of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon

a motion by the Director of the Bureau of Prisons ("BOP"). *See* Pub. L. No. 98-473, § 224(a), 98

Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP

Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir.

2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008)

(denying  motion for compassionate release because § 3582 "vests absolute discretion" in the

BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed

motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See*

*Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing*

*Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice)

(observing that, on average, only 24 inmates were granted compassionate release per year between

1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism

when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018).

As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term

of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the

defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a

motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the

warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted

his administrative remedies, he may petition a court directly for compassionate release.

Section 3582(c) is titled "Modification of an imposed term of imprisonment."   Under

§ 3582(c)(1)(A), the court, upon motion of the Director of BOP or the defendant, upon exhaustion

of administrative rights,  may modify the defendant's sentence if, "after considering the factors set

forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), a defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of the sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with the policy statement issued by the Sentencing Commission in U.S.S.G. § 1B1.13.

U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement." The text mirrors the statute. Application Note 1 of U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows (emphasis added):

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:[5]
>
> (A)   Medical Condition of the Defendant.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> > (I) **suffering from a serious physical or medical condition**,
> >
> > (II) suffering from a serious functional or cognitive impairment, or
> >
> > (III) experiencing deteriorating physical or mental health because of the aging process,

---

[5] Subsection (2) of U.S.S.G. § 1B1.13 establishes as a relevant factor that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

that **substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility** and from which he or she is not expected to recover.

Other extraordinary and compelling reasons include the age of the defendant (Application Note 1(B)) and Family Circumstances (Application Note 1(C)).  Application Note 1(D) permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D).

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. The Guideline policy statement in U.S.S.G. § 1B1.13, along with the application notes and BOP Program Statement 5050.50, define "extraordinary and compelling reasons" for compassionate release based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."

The defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  And, compassionate release is a rare remedy.  *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### B.  COVID-19

It is necessary to acknowledge the circumstances that have led to defendant's Motion in order to fully appreciate what is at stake.  We are currently "in the grip of a public health crisis

more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, ___ F. Supp. 3d ___, 2020 WL 2556496, at *1 (D. Md. May 20, 2020).  That crisis is COVID-19.[6]  The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The virus is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  Although many people who are stricken with the virus experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories…."  *Antietam Battlefield KOA*, 2020 WL 2556496, at *1 (citation omitted).  And, there is currently no vaccine, cure, "or proven effective treatment" that is available.  *Id.* (citation omitted).

As of June 3, 2020, COVID-19 has infected over 1.8 million Americans and caused over 107,000 deaths.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed June 4, 2020).  Moreover, according to the Centers for Disease Control and Prevention ("CDC"), certain risk factors increase the chance of severe illness.  The risk factors include age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are At Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868,

---

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *Antietam Battlefield*, 2020 WL at 2556496, at *1 n.1 (citation omitted).

at *1 (E.D. Mich. May 21, 2020).  For a significant period of time, life as we have known it came

to a halt.  In some jurisdictions, businesses are beginning to reopen; in others, however, schools

and businesses remain shuttered, either entirely or partially.

Thus far, the only way to slow the spread of the virus is to practice "social distancing."  *See*

*Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE

CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed May 21, 2020).  Social distancing

is particularly difficult in the penal setting, however.  *Seth*, 2020 WL 2571168, at *2.  Prisoners

have little ability to isolate themselves from the threat posed by the coronavirus.  *Id*., *see also*

*Cameron*, 2020 WL 2569868, at *1.  And, they are not readily able to secure products to protect

themselves, such as masks and hand sanitizers.  Consequently, correctional facilities are especially

vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-

0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are

especially vulnerable to outbreaks of COVID-19."); *see also*  Letter of 3/25/20 to Governor Hogan

from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public

Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and

prisons, the inability to employ effective social distancing measures, and the many high-contact

surfaces within facilities, make transmission of COVID-19 more likely");[7] *accord Brown v. Plata*,

563 U.S. 493 519-20 (2011) (referencing a medical expert's description of the overcrowded

California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help

prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  To that end, the BOP has

implemented substantial measures to protect prisoners from COVID-19 and to treat those who are

---

[7] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

infected.  *See* ECF 36 at 7-8 (detailing measures that BOP has implemented to combat COVID-19).  Nevertheless, as in the community at large, the virus persists.  As of June 4, 2020, the BOP reported that 1,993 inmates and 179 BOP staff tested positive for COVID-19, and 75 inmates and one staff member have died from the virus.  *See* https://www.bop.gov/coronavirus/.  With respect to USP Lompoc, fifteen inmates and five staff members are presently infected, and two inmates have died.  *Id.*  At FCI Lompoc, one inmate is presently infected, along with seven staff members, and two inmates have died.  *Id.*[8]

In light of the pandemic, Attorney General Barr has urged the BOP to consider home confinement for vulnerable inmates, where appropriate.  Pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), on April 3, 2020, he directed the BOP to extend the use of home confinement where suitable.  *See* ECF 31 at 13 n.2 (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and BOP employees from COVID-19.  DOJ recently adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* ECF 36 at 9-10; *see also* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).  And, emerging data suggests that preexisting cardiovascular conditions are especially dangerous to COVID-19 patients.  *See* https://bit.ly/3dk40pw.

On May 16, 2020, the ACLU filed a lawsuit on behalf of inmates incarcerated at FCI and USP Lompoc, alleging that the institution's response to COVID-19 violates the Eighth Amendment.  *See Torres et al. v. Milusnic et al.*, 2:20-cv-04450, ECF 1 (C.D. CA May 16, 2020).  The *Torres* plaintiffs allege that "more than 1,000 incarcerated persons have tested positive for

---

[8] The number of positive cases of COVID-19 at the Lompoc complex, as well as the extent of the BOP's testing efforts there, vary by source.

COVID" in the Lompoc complex, which includes FCI Lompoc and USP Lompoc. *Id.* ¶ 1.  Further, they contend that inmates reporting COVID-like symptoms have been denied medical treatment for days and placed in solitary confinement without medical care.  *Id.* ¶ 6.  In addition, they allege the existence of "unsanitary makeshift living spaces" that have "completely failed to stop or even slow the spread of the virus."  *Id.* ¶ 7.  According to the *Torres* plaintiffs, a prisoner who tested positive at FCI Lompoc was "abruptly moved to a makeshift cell block set up in a warehouse at USP Lompoc" where he is not permitted to shower or change clothes.  *Id.* ¶ 13.

Of import here, it is undisputed by the government that Riley's cardiomegaly is sufficiently serious to qualify as a compelling basis to modify his sentence.

## C.  Analysis

Riley contends that he "suffers from cardiomegaly, otherwise known as an enlarged heart. . . .This condition can lead to heart failure, blood clots, or cardiac arrest.  Because of this condition, Riley must take extreme precautions to avoid any type of activity that would tax his heart, like exercise or heavy breathing."  ECF 31 at 2.  According to Riley, he is at particularly high risk if infected with COVID-19 due to this "heart condition that already weakens his respiratory system. . . ." *Id.* at 3.

Significantly, the government concedes that Riley is eligible for compassionate release, based on his heart condition.  ECF 36 at 8, 10.  According to the government, "defendant's medical records do identify certain medical conditions, and corroborate the defendant's report in his motion that he suffers from 'cardiomegaly,' or an enlarged heart." *Id.* at 10.

The Court must also determine whether a modification of Riley's sentence is consistent with the Sentencing Commission's policy statement, including its command that a reduction is appropriate only if the defendant  "is not a danger to the safety of any other person or to the

community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). To determine whether a defendant is a danger to the community, 18 U.S.C. § 3142(g) directs the court to consider the (1) "nature and circumstances of the offense charged"; (2) the "weight of the evidence against the person"; (3) the "history and characteristics of the person"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." Here, too, the government concedes that the defendant does not present a danger to the community in a way that would preclude a reduction under § 3582(c)(1). ECF 36 at 11.

The court must next consider the factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A). Those factors include, 18 U.S.C. § 3553(a): (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

The government argues that "the totality" of these factors "weighs against a reduction of sentence." ECF 36 at 12. It correctly contends that Riley "committed a very serious, very substantial drug distribution offense involving more than three kilograms of fentanyl, a dangerous narcotic that is responsible for a large number of overdose deaths in Baltimore, in Maryland, and throughout the country." *Id.* Moreover, the government maintains that money laundering in furtherance of the drug distribution is also serious, as is the fact that Riley "fled to Mexico in order to evade prosecution." *Id.* Because of the seriousness of the underlying offense, Riley's two previous federal convictions for drug trafficking, as well as his prior convictions for burglary (2016) and battery on a police officer (2010), the government argues, *inter alia*, that the need for deterrence weighs against reducing Riley's sentence. *Id.* at 12-13. However, the government

13

"does recognize that there is no violence in this case." *Id.* at 13.   And, the government acknowledges that the presence of COVID-19 at the Lompoc complex "is a matter of concern." *Id.* at 14.

Riley underscores that he will be eligible for home confinement on June 30, 2021. Therefore, from his perspective, his sentence would, in effect, only be reduced by one year. ECF 40 at 2. He will have served "nearly 50% of his original sentence and has accrued enough good conduct time that his anticipated release date," absent a release for home confinement, "is only a year and a half away." ECF 31 at 14.

In addition, Riley maintains that Lompoc lacks the resources to prevent the spread of COVID-19; he has "informed counsel that he is sharing a six-by-eight-foot cell with one other inmate. . .only one person could stand up at a time." ECF 40 at 3.  And, he contends that the movement between facilities in the Lompoc complex "has made the BOP's isolation strategy completely ineffective." *Id.*  Moreover, he argues that inmates have been receiving substandard medical care at Lompoc, both for COVID-19 and other illnesses. *Id.* at 4.  And, in Riley's view, the pandemic has "increased the severity of his original punishment," and he posits that the "unforeseen circumstances . . . justify a reduction in his sentence." *Id.*

Riley's reentry plan to "ensure his and the public's health and safety" is to "initially reside with a family friend. . . at his home in Pleasantville, California." ECF 31 at 14.  This family friend lives within driving distance of Lompoc, and Riley claims that he would be able to self-quarantine there for 14 days in a separate room. *Id.*  After his quarantine period, Riley "would reside with his mother, Angela Riley, at their family home in Parkville, Maryland." *Id.* at 15.

In the event that the Court orders a reduction of Riley's sentence, the government recommends that Riley be placed on home detention through December 30, 2021, the date

"originally set for his possible release from BOP" in order to "provide some proportionality between the defendant's crime, his past record (including federal offenses), and the reduced sentence." ECF 36 at 14-15. And, the government recommends that, prior to release, Riley quarantine for 14 days at Lompoc to "minimize the possibility of any spread of COVID-1 from the inmate to the public." *Id.* at 15.

The Court is of the view that the C plea was extremely lenient, particularly in view of the defendant's two prior federal convictions. But, the outbreak of COVID-19 at Lompoc was not anticipated. Nor is it theoretical. And, the risk it poses to Riley is serious, given his underlying medical condition. "People with heart disease or a history of stroke are at increased risk of coronavirus infection, and of suffering more severe symptoms, according to the American Heart Association (AHA)." *See* https://wb.md/3eElayn. Riley's enlarged heart affects both his cardiovascular and his pulmonary systems (ECF 31 at 2), putting him at significant risk. Moreover, it is noteworthy that he will be eligible for home confinement in just one year.

The COVID-19 outbreak has "sufficiently increased the severity of the sentence beyond what was originally anticipated. . . ." *United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. April 28, 2020). Because the government concedes that Riley poses no risk to the community, and because he will be eligible for home confinement in one year, I conclude that his Motion should be granted.

To minimize the risk of spreading COVID-19 from the Lompoc complex to the general public, Riley should be quarantined in the complex for a period of fourteen days. And, I completely agree with the government that Riley should serve one year of home confinement upon his release from Lompoc. *See United States v. Pena*, 15-cr-551-AJN, 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) (noting that the fact that an inmate "may be transferred to home

confinement in a little more than one year from now" weighed in favor of granting compassionate release). To the extent feasible, given the pandemic, the home confinement should include electronic monitoring.

### III.  Conclusion

For the foregoing reasons, I shall grant the Motion (ECF 29). Riley's sentence shall be reduced to time served plus fourteen days. He shall quarantine for a period of fourteen days at Lompoc and, as a condition of supervised release, he shall serve a period of home confinement for one year.

A separate Order follows.


Date:   June 4, 2020                                                   /s/
                                                        Ellen Lipton Hollander
                                                        United States District Judge